# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| CHANA KRINSKY, JOSEPH EPSTEIN, ABE GALLIS, and MENACHEM SHEMTOV, Individually and On Behalf of All Others Similarly Situated,<br><br>                             Plaintiffs,<br><br>          v.<br><br>NESTLE WATERS NORTH AMERICA, INC.,<br><br>                        Defendant. | **Case No.**<br><br>**<u>CLASS ACTION COMPLAINT</u>**<br><br>**<u>JURY TRIAL DEMANDED</u>** |

Plaintiffs Chana Krinsky, Joseph Epstein, Abe Gallis, and Menachem Shemtov (collectively, "Plaintiffs"), each individually and on behalf of all other persons similarly situated, by their undersigned attorneys, for their complaint against Defendant Nestle Waters North America, Inc. ("Nestle Waters" or "Defendant"), allege the following based upon personal knowledge as to themselves and their own acts, and information and belief as to all other matters. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

1.      This is a class action against Nestle Waters for fraud and violations of the New Jersey Consumer Fraud Action, New York General Business Law Sections 349 and 350, and the New Hampshire Consumer Protection Act, arising out of Defendant's systemic misrepresentations regarding the characteristics and sources of its Poland Spring® brand "100% Natural Spring Water" ("Poland Spring Water"). For more than two decades, Defendant has reaped millions of dollars in profits by bottling and selling common groundwater, falsely and illegally labeled and marketed as "spring water". In reality, however, ***none*** of the water marketed and sold by

Defendant as Poland Spring Water actually meets the definition of "spring water" under U.S. Food and Drug Administration ("FDA") regulations.  Accordingly, as a result of Defendant's knowing misrepresentations, American consumers have significantly overpaid unjustified premiums for groundwater falsely labeled as spring water.

2.     As described below, the FDA has strictly regulated the labeling and selling of bottled water since promulgating comprehensive and highly specific regulations defining different types of drinking water—*e.g.*, spring water, purified water, well water, mineral water—and governing the manner in which water must be collected.

3.     Since acquiring the Poland Spring Water brand in 1992, Nestle has sold billions of gallons of drinking water to U.S. consumers in bottles with labels referencing "100% Natural Spring Water" and bearing images of natural springs flowing through unsullied wilderness.  The Poland Spring Water website prominently states: "A lot has changed since we got our start in 1845, but one thing remains the same: Poland Spring® Brand 100% Natural Spring Water is still sourced from natural springs in Maine – 8 of them in fact."

4.     In reality, however, ***none*** of these eight purported "natural springs"—Poland Spring, Clear Spring, Garden Spring, Evergreen Spring, Cold Spring, White Cedar Spring, Spruce Spring, and Bradbury Spring—satisfies the FDA's unambiguous definition of spring water, nor does water collection from these sites comply with the FDA's requirements for spring water extraction.  As described below, at each of these eight sites, Defendant is simply collecting and bottling common groundwater, which it then sells at an inflated prices by marketing it as "100% Natural Spring Water."

5.      In sum, for the reasons set forth herein, Defendant's marketing and selling of so-called "Poland Spring Water" is nothing less than a massive sham, yielding Nestle Waters an estimated millions of dollars in inflated profits at the expense of American consumers.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d) because the aggregate amount in controversy exceeds $5,000,000 and there is diversity between a plaintiff and a defendant.

7.      Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b)(1) because Defendant is a resident of this Judicial District under 28 U.S.C. §1391(c).  Venus is also proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred within this Judicial District.

## PARTIES

8.      Plaintiff Chana Krinsky is a resident of Manchester, New Hampshire.  Ms. Krinsky purchased Poland Spring bottled water on numerous occasions because she believed it to be pure and natural spring water, based on its labels bearing the representation "100% Natural Spring Water."

9.      Plaintiff Joseph Epstein is a resident of Brooklyn, New York.  Mr. Epstein purchased Poland Spring bottled water on numerous occasions because he believed it to be pure and natural spring water, based on its labels bearing the representation "100% Natural Spring Water."

10.      Plaintiff Abe Gallis is a resident of Clifton, New Jersey.  Mr. Gallis purchased Poland Spring bottled water on numerous occasions because he believed it to be pure and natural spring water, based on its labels bearing the representation "100% Natural Spring Water."

11.     Plaintiff Menachem Shemtov is a resident of Basking Ridge, New Jersey.  Mr. Shemtov purchased Poland Spring bottled water on numerous occasions because he believed it to be pure and natural spring water, based on its labels bearing the representation "100% Natural Spring Water."

12.     Defendant Nestle Waters is a Delaware corporation with its principal executive offices located at 900 Long Ridge Road, Building 2, Stamford, Connecticut.  Nestle Waters is a business unit of Nestle, S.A., with principal executive offices located in Vevey Vaud, Switzerland.

## SUBSTANTIVE ALLEGATIONS

### Fundamental Hydrogeological Principles

13.     A complete explanation of the nature of Defendant's misconduct requires, as an initial matter, an explanation of some core principles of hydrogeology—*i.e.*, the distribution and movement of groundwater under the earth's surface.

14.     The term "groundwater" refers to water existing beneath the earth's surface, in the fractures of rock formations and in soil pore spaces.  Naturally replenished, or "recharged", by surface water from streams, rivers, and precipitation, groundwater likewise flows to and re-emerges, or "discharges", from the earth's surface naturally by seepage (as puddles or through the bottoms of lakes, rivers, streams, or swamps) or via natural springs.  Groundwater constitutes roughly 20% of the world's fresh water supply.  Because it is less vulnerable to pollution than surface water, groundwater is commonly used for public water supplies.

15.     "Hydraulic conductivity" refers to the speed at which groundwater can flow through the layers of subsurface soils or materials, or "aquifers", in which it exists.  Relative to surface water—*e.g.*, a river or stream—groundwater flows significantly more slowly through these subsurface strata.  Hydraulic conductivity is influenced by a number of factors, including, *inter*

*alia*, topography and the permeability of the material comprising the stratum. For example, a stratum composed of clay is less permeable, and thus likely to have slower hydraulic conductivity, than a stratum composed of sand and gravel.

16.     The varying hydraulic conductivity as between different subsurface strata is a factor in both the formation of springs and how much water can be drawn from wells dug into various strata.   Sand and gravel aquifers tend to have significantly greater horizontal hydraulic conductivity than vertical hydraulic conductivity, and accordingly, spring flow from such aquifers tends to occur horizontally.

17.     Where a clay stratum exists on top of a sand and gravel stratum (as illustrated below), groundwater flowing through the sand and gravel stratum will be pressurized by the weight of groundwater present in the clay stratum.   Accordingly, if a well is drilled through the clay stratum and into the sand and gravel stratum, water will flow unaided through the well to the surface, driven by the nature pressure of the confined groundwater.   A well drilled into an aquifer in this fashion is known as an "artesian well."



18.     As described in greater detail below, Defendant has placed a number of artesian wells at its purported "spring" sites and falsely described these wells as springs or falsely cited the

presence of these wells as proof of the existence of springs nearby.  These wells are ***not*** springs within either hydrogeological parlance or the meaning of applicable FDA regulations.  Moreover, contrary to Defendant's misrepresentations, these wells are in fact evidence that springs do ***not*** exist near these wells, as the presence of a spring at these sites would relieve the natural pressure necessary to drive water upward, unaided, through an artesian well.

### FDA Regulation of Bottled Water

19.     Initially adopted in November 1995 and currently appearing at 21 C.F.R. § 165.110, the FDA's standards for the identification and labeling of bottled drinking water take into account the foregoing hydrogeological principles and require the bottled water industries to label their product offerings accordingly.

20.     The FDA requires that bottled water intended for human consumption is labeled as "bottled water" or drinking water."  Exceptions apply for water products meeting specific FDA definitions, or "standards of identity."  Such water products may be labeled as (i) "artesian water"; (ii) "ground water"; (iii) "mineral water"; (iv) "purified water" (or in the alternative, may be specifically labeled by reference to the purification method used—*e.g.*, "distilled," "reverse osmosis", or "deionized"); (v) "sparkling water"; (vi) "spring water"; (vii) "sterilized water"; or "well water."  *See* 21 C.F.R. § 165.110(a)(2).

21.     Pursuant to the FDA's regulations, the "standard of identity" for spring water clearly states the three characteristics that water must possess in order to be labeled as spring water. Spring water must be:

> (i) "derived from an underground formation";
>
> (ii) from which "a ***natural*** force" causes water to "***flow*** to the surface";
>
> (iii) "through a ***natural*** orifice."

21 C.F.R. § 165.110(a)(2)(vi) (emphases added).

22.    Two elements of this standard of identity merit particular attention.  First, spring water must "flow" to the surface—that is, spring water must have a perceptible current at the spring's orifice.  This element excludes from the standard of identity groundwater that emerges from the earth via seepage.  Otherwise, the definition of spring water might encompass water collected from nearly any pond, swamp, river, lake or stream, so long as the body of water is fed at least in part by groundwater seepage.  Second, the water must be driven by natural forces through a natural—as opposed to man-made—opening.

23.    In addition to defining spring water, the FDA's standard of identity sets forth the only two permissible means by which spring water must be collected from the earth in order to be labeled as "spring water."  Spring water must be collected:

> (i) directly "at the spring"; or
>
> (ii) through a "bore hole"—*i.e.*, a well—"tapping the underground formation feeding the spring."

*Id.*

24.    For water collected via well rather than directly at the spring, the FDA's standard of identity requires that collection of the water adheres to five conditions for the water to be lawfully labeled as spring water:

> (i) the water collected from each bore hole must be "from the same underground stratum as the spring";
>
> (ii) there must be "a measurable hydraulic connection using a hydrogeologically valid method between the bore hole and the natural spring";
>
> (iii) the water must have "all the physical properties, before treatment . . . as the water that flows naturally to the surface of the earth" at the spring;
>
> (iv) the water must be "of the same composition and quality" before treatment as the water flowing naturally to the surface; and

(v) water must continue "to flow naturally to the surface . . . through the spring's natural orifice" – in other words, water cannot be labeled as spring water if using wells to collect the water halts the spring's natural flow.

*Id.*

25.    Concurrently with the adoption and release of the FDA's standards of identity for bottled water, the agency published "Supplementary Information," expounding on the standards and addressing comments received during the notice-and-comment proceedings in the course of its rulemaking process.  *See* 60 Fed. Reg. 57,076 (Nov. 13, 1995).  Several items in the Supplementary Information publication are particularly relevant to Defendant's misconduct.

26.    First, the purpose of the FDA's "standard of identity" definitions was to protect consumers.  The FDA expressly stated "that consumers consider bottled water to be of a higher quality than other kinds of bottled water."  *Id.* at 57,090.  Accordingly, the FDA found that it was crucial for manufacturers of spring water to define specifically "where the water comes from," *id.* at 57,090, in the interests of "honesty and fair dealing" with respect to consumers.  *Id.* at 57,076.

27.    Second, given consumer perceptions of the meaning of "spring" and "spring water" the FDA stated that "it is ***critical*** that manufacturers of 'spring water' identify the exact location of the natural orifice where the spring flows from the earth" and to maintain records of these locations in order to "provide FDA with this information upon request."  *Id.* at 57,096 (emphasis added).

28.    Third, any water collected by well must "always have the same physical properties, composition, and quality as water that flows naturally to the earth."  Here, the FDA's concern was ensuring that water collected by well had "traveled the same [subsurface] path as the water that flows from the natural orifice of the spring," and would thus have the same characteristics and

properties—*e.g.*, turbidity, color, taste, pH balance, mineral and organic content, odor, temperature, molecular structure, or hardness. *Id.* at 57,093, 57,096.

29.     Fourth, in furtherance of its goal of ensuring that water drawn from a well truly "traveled the same path" as water collected at the spring's orifice, the FDA stated that all well water must "be from the same underground stratum that feeds the spring." *Id.* at 57,090, 57,093.

30.     Fifth, the spring must continue to flow through its natural orifice while any well is pumping. Here, the FDA's concern was that pumping a well risks inducing a "reverse flow"—a phenomenon in which otherwise unconnected surface water is drawn downward through the spring and ultimately into the well—thereby yielding a mixture of surface water and groundwater that would not legally constitute spring water under the FDA's standard of identity. *Id.* at 57,094-95.

31.     Sixth, the FDA imposed on all bottlers of spring water an obligation to continually assure that water collected via well is "the same" as water collected at the spring's orifice. As stated above, the mere operation of a well might change "the water flow" of a spring and "alter the composition of the ground water," such that the water no longer qualifies as spring water within the meaning of the FDA's regulations. *Id.* at 57,094.

32.     Seventh, the FDA stated that groundwater discharged diffusely via seepage is not spring water, stating, in part, that if water is subject to changes "in water characteristics . . . which closely correlate to climatological or surface water conditions," then the water is under the influence of surface water, and does not constitute "spring water" under the FDA's standard of identity. *Id.* at 57,097.

33.     Eighth, the FDA similarly stated that neither wet spots on the ground that bead water nor artificial alterations of the ground qualified as springs. In response to comments to the FDA's proposed spring water definition, the FDA stressed that by definition, a spring required "a

natural force causing the water to flow to the surface through a natural orifice" and that unless the water "flow[s] to the surface of the earth from the underground source without development of the area or the use of external force, then the water does not qualify for use of the name 'spring water.'" *Id.*

**Poland Spring's Purported "Natural Springs" Are Merely Groundwater Collection Sites**

34.    The Poland Spring brand relies heavily on imagery of pristine natural springs, forests, and mountains, all of which feature prominently on the brand's bottle labels and on its website.  Indeed, the website boasts, in specific and unambiguous language: "A lot has changed since we got our start in 1845, but one thing remains the same: Poland Spring® Brand 100% Natural Spring Water is still ***sourced from natural springs in Maine – 8 of them in fact.***" (Emphasis added.)



35.    In reality, however, ***none*** of Defendant's eight purported "natural springs" qualifies as a spring within the meaning of the applicable FDA regulations, and ***none*** of the water bottled and marketed by Defendant as "100% Natural Spring Water" under the Poland Spring brand is anything other than common groundwater.

**A.  The "Poland Spring" Site**

36.    On the Poland Spring Website, in a section entitled "Meet The Springs," Defendant identifies the eponymous Poland Spring, located in Poland, Maine, as a source of the brand's spring water.



37.    As Defendant admits, the company "no longer use[s] the original Poland Spring source," the flow rate of which fell below a commercially viable level in the 1970s.  Rather, the company asserts to regulators that it collects water from wells that are hydraulically connected to "subaqueous springs" that it claims exist at the bottom of Lower Range Pond, a body of surface water located hundreds to thousands of feet away from the wells at issue.

38.    As an initial matter, Defendant has never proven the existence of these purported "subaqueous springs."  Furthermore, Defendant's regulatory filings reflect a changing narrative as to the actual existence of and/or location of these purported springs.

39.    In 1983, for instance, in response to an inquiry by a New Jersey regulator, Perrier (prior to its acquisition by Nestle Waters) asked a Maine official to write a letter to the regulator

advising him that there "is a very substantial flow of spring water on the Poland Spring property." Perrier did not assert the existence of subaqueous springs at that time, but rather speculated that a kettle pond on the property was "spring fed."

40.     Four years later, in 1987, Perrier's legal counsel, Pierce, Atwood, Scribner, Allen, Smith & Lancaster ("Pierce Atwood"), filed an application on Perrier's behalf for a Bulk Transport Permit in order to transport Poland Spring Water outside the boundaries of Poland Township.  The letter submitted with the application claimed that the company was collecting water "from a free flowing spring located on Ricker Hill" and from wells "drilled into the aquifer which is the source of the Ricker Hill spring."  At that time, Perrier did not assert the existence of any subaqueous springs.

41.     Perrier first began positing the existence of subaqueous springs under the Lower Range Pond in 1990.  However, a series of hydrogeological reports commissioned by the company since 1992 and 2000, and cited in the company's regulatory filings and correspondence, all failed to provide persuasive evidence of the existence of a subaqueous spring.  Rather, these reports simply showed that groundwater entered the Lower Range Pond diffusely, via seepage, rather than via any identifiable spring orifice.

42.     In short, Defendant's regulatory filings make no showing whatsoever that Defendant's wells in Poland Spring collect water from any natural spring source in Poland Spring, or indeed that Defendants are doing anything other than collecting common groundwater by well from a sand and gravel aquifer.

43.     Accordingly, the water that Defendant collects at its Poland Spring site does not satisfy the FDA's standard of identity for spring water: (i) it does not meet the agency's three-part definition of spring water: (ii) it is not collected in compliance with FDA regulations governing

collection via bore hole; and (iii) despite Defendant's labels touting Poland Spring Water as "100% Natural Spring Water," it is in reality nothing more than common groundwater.

**B.   The "Clear Spring" Site**

44.   Poland Spring's website touts the water collected from the Clear Spring site, located in Hollis, Maine, as the product of "springs [that] bubble up through sand and gravel, providing the perfect natural filtration system for refreshing spring water."



45.   In reality, no natural spring exists on Defendant's property in Hollis.  Defendant owns and operates five wells in Hollis, located near a wetland containing man-made canals.  By all indications, Defendant is merely collecting water from the aquifer underlying the wetland— which is fed by groundwater seepage and precipitation, and thus not a "spring" within the meaning of FDA regulations.  Strikingly, a PBS NewsHour broadcast from 2008 appears to show water flowing out of a man-made orifice at the bottom of one of the canals.  This suggests that Defendant, in an effort to further the illusion that it is collecting natural spring water from its wells in Hollis,

has gone so far as to run pipes from wells into the wetland's canals in order to artificially create the appearance of a natural flow in the canals.

46.    Accordingly, the water that Defendant collects at its Clear Spring site does not satisfy the FDA's standard of identity for spring water: (i) it does not meet the agency's three-part definition of spring water: (ii) it is not collected in compliance with FDA regulations governing collection via bore hole; and (iii) despite Defendant's labels touting Poland Spring Water as "100% Natural Spring Water," it is in reality nothing more than common groundwater.

**C. The "Garden Spring" Site**

47.    On Poland Spring's web site, the Company touts Garden Spring, located in Poland, Maine, as possessing the "same sand and gravel deposits as our Poland Spring source" and "famous around these parts for its fresh tasting natural spring water."



48.    Defendant's purported "Garden Spring"—which appears to be referenced nowhere other than Defendant's own marketing materials—came into existence in 1989.  After workers excavating old gravel pits in Poland inadvertently struck the water table, resulting in man-made

holes that filled with groundwater on a seasonal basis, the Maine Bottling Company drilled a well nearby and started collecting and selling the groundwater it collected.  Nestle Waters subsequently acquired the site, and then undertook extensive efforts to dredge and modify a portion of the nearby wetlands in order to isolate one of the man-made holes and preserve its existence.  Nestle now falsely represents that this old, flooded gravel pit contains a naturally occurring spring.

49.     Accordingly, the water that Defendant collects at its Garden Spring site does not satisfy the FDA's standard of identity for spring water: (i) it does not meet the agency's three-part definition of spring water: (ii) it is not collected in compliance with FDA regulations governing collection via bore hole; and (iii) despite Defendant's labels touting Poland Spring Water as "100% Natural Spring Water," it is in reality nothing more than common groundwater.

**D.  The "Evergreen Spring" Site**

50.     Poland Spring's Evergreen Spring operations are located in Fryeburg, Maine.



51.     Defendant's purported "Evergreen Spring" is a small man-made pond located near a well owned by the Fryeburg Water Co. ("FWC"), a public utility chartered in the late 19th century to supply the municipality's water needs.  Any natural spring in the vicinity is conspicuously absent from the maps of the Maine Geological Survey, a state-wide survey of Maine's water resources, bedrock materials, mineral resources, and coastal properties.  Because "Evergreen Spring" is man-made, it would certainly not qualify as a "spring" under FDA regulations.

52.     FWC owns two wells in the area, one of which supplies tap water to the village of Fryeburg, while Nestle Waters has collected water from the other well, which also doubles as Fryburg's back-up supply well, under bulk water purchase contracts and leases with FWC or its affiliates since 1997.  In violation of FDA regulations, Defendant has never indicated on its Poland Spring Water labels that its water comes in part from "a municipal source."

53.     Accordingly, the water that Defendant collects at its Evergreen Spring site does not satisfy the FDA's standard of identity for spring water: (i) it does not meet the agency's three-part definition of spring water: (ii) it is not collected in compliance with FDA regulations governing collection via bore hole; (iii) despite Defendant's labels touting Poland Spring Water as "100% Natural Spring Water," it is in reality nothing more than common groundwater; and (iv) in violation of the FDA's labeling requirements, Defendant does not indicate on its Poland Spring Water labels that the water is sourced from a municipal water system.

**E.  The "Cold Spring" Site**

54.     Poland Spring's website describes Cold Spring, located in Denmark, Maine, as "nestled in a picturesque mossy glen in Western Maine."  Defendant operates two wells in the Denmark area.



# COLD SPRING

## A GREAT PLACE TO CHILL

In the shadow of Pleasant Mountain (which is as lovely as it sounds), Cold Spring is nestled in a picturesque mossy glen in Western Maine. Surrounded by waterways, rolling hills and dense forests, the area around Cold Spring looks a lot like the brochure for a pretty amazing summer camp (because it is).

55.    However, there is no reliable record of a "Cold Spring existing in or near Denmark. The Maine Geological Survey does not indicate the existence of any "Cold Spring" in the vicinity of Denmark.  A "Cold Spring" is similarly absent from U.S. Geological Survey maps.

56.    Most telling, however, is Defendant's 2005 application to the Town of Denmark for a Water Extraction Permit (the "Permit Application").  Despite many references to "onsite springs" and "spring activity" at the site in question, the Permit Application materials contain no photographs, drawings, or diagrams showing the natural orifices of these purported springs. Rather, the only water discharge the Permit Application describes is in the form of seepage— which does not constitute a "spring" under the FDA's regulations.

57.    Instead, the Permit Application materials only indicate that Defendant's collection activities in Denmark are limited to two wells drawing water from a sand and gravel aquifer, not from any genuine spring.

58.    Accordingly, the water that Defendant collects from its Cold Spring site does not satisfy the FDA's standard of identity for spring water: (i) it does not meet the agency's three-part

definition of spring water: (ii) it is not collected in compliance with FDA regulations governing

collection via bore hole; and (iii) despite Defendant's labels touting Poland Spring Water as "100%

Natural Spring Water," it is in reality nothing more than common groundwater.

**F.  The "White Cedar Spring" Site**

59.    White Cedar Spring, touted by Defendant as "the jewel of the western mountains,"

is located in Dallas Plantation, Maine.



60.    However, as with other of Defendant's purported "springs," the Maine Geological

Survey does not indicate the existence of any natural spring called "White Cedar Spring."  Like

other of Defendant's purported "springs," White Cedar Spring appears to be nothing more than a

small pond, created artificially when a berm was raised to support a railway line, located near

Defendant's two wells in the area.  Defendant's regulatory filings submitted in support of its

application to develop the area conspicuously make no mention of the berm, and assert instead that

groundwater at the site was discharged as a natural spring.  Nor did any of Defendant's regulatory

filings demonstrate that White Cedar Spring satisfied the elements of the FDA's standard of identity and qualified as a natural spring.

61.    Accordingly, the water that Defendant collects from its White Cedar Spring site does not satisfy the FDA's standard of identity for spring water: (i) it does not meet the agency's three-part definition of spring water: (ii) it is not collected in compliance with FDA regulations governing collection via bore hole; and (iii) despite Defendant's labels touting Poland Spring Water as "100% Natural Spring Water," it is in reality nothing more than common groundwater.

**G.  The "Spruce Spring" Site**

62.    Defendant's Spruce Spring site is located in Pierce Pond Township, Maine.



63.    Again, the Maine Geological Survey does not indicate the existence of a "Spruce Spring," or indeed any natural spring at all, in the vicinity of Defendant's wells in Pierce Pond Township.  Likewise, while the deeds for Defendant's land purchases in Pierce Pond Township reference other bodies of water on Defendant's property, there is no reference in the deeds to any

"Spruce Spring." Instead, hydrogeological data submitted by Defendant to Maine's Department of Environmental Protection in 2004 indicates that what Defendant characterizes as a "spring" at Pierce Pond Township is merely groundwater seepage—and thus not a natural spring within the meaning of FDA regulations.

64.     Accordingly, the water that Defendant collects from its Spruce Spring site does not satisfy the FDA's standard of identity for spring water: (i) it does not meet the agency's three-part definition of spring water: (ii) it is not collected in compliance with FDA regulations governing collection via bore hole; and (iii) despite Defendant's labels touting Poland Spring Water as "100% Natural Spring Water," it is in reality nothing more than common groundwater.

**H. The "Bradbury Spring" Site**

65.     According to Defendant's website, Bradbury Spring, located in Kingfield, Maine, is "partially fed by melting snow and rainwater that comes down from the mountains and reemerges as spring water."



66.    Once again, the Maine Geological Survey gives no indication of a "Bradbury Spring's" existence, or indeed of any natural springs on Defendant's property in Kingfield.  Nor does there appear to be any mention of a "Bradbury Spring" in publicly available records other than Defendant's own marketing materials.  Moreover, Defendant's wells in Kingsfield are close enough to channels of a nearby river that they are highly likely to be drawing in surface water, meaning that the water collected at those wells is likely common groundwater mixed with surface water.

67.    Accordingly, the water that Defendant collects from its Bradbury Spring site does not satisfy the FDA's standard of identity for spring water: (i) it does not meet the agency's three-part definition of spring water: (ii) it is not collected in compliance with FDA regulations governing collection via bore hole; and (iii) despite Defendant's labels touting Poland Spring Water as "100% Natural Spring Water," it is in reality nothing more than common groundwater, likely mixed with surface water.

### Defendant's False and Deceptive Product Labels

68.    In light of the foregoing, it is abundantly clear that Poland Spring's entire brand entity rests up on a massive fraud, perpetuated on a constant basis by the misrepresentations and misleading images printed on every bottle of Poland Spring Water.

69.    First, each Poland Spring Water label prominently represents, directly under the brand name, that it is "100% Natural Spring Water."  As discussed above, this is simply false.

70.    Second, Poland Spring's labels and marketing materials inform consumers that Poland Spring Water is sourced from the eight purported "springs" described above: Clear Spring, Evergreen Spring, Spruce Spring, Garden Spring, White Cedar Spring, Bradbury Spring, Poland Spring, and/or Cold Spring.  In fact, literally ***none*** of those eight sites is in fact a natural spring.

71. Third, the majority of Poland Spring Water labels throughout the product's history bear images suggestive of a natural spring located in a pristine wilderness. Again, given that none of Defendant's water is sourced from natural springs, this is highly misleading.





72. Defendant's conduct is nothing less than a massive fraud perpetrated against Plaintiffs and the other Class members, netting Defendant millions of dollars in ill-gotten profit, at the expense of American consumers.

**All Statutes of Limitations Are Tolled**

**A. Fraudulent Concealment**

73. Since the FDA's enactment of regulations setting forth standards of identity for bottled water in 1995, Defendant has known that its labeling and marketing of Poland Spring Water as "100% Natural Spring Water" was false and deceptive.

74. Defendant's false and deceptive labeling and marketing of Poland Spring Water was at all relevant times known by and observable to only Defendant, its agents, and its employees, and was at all relevant times concealed from Plaintiffs, Class members, State Sub-Class Members, and other purchasers of Poland Spring Water.

75.     Since at least November 5, 2003, all applicable statutes of limitations have been tolled by Defendant's active and knowing fraudulent concealment and denial of the facts alleged in this Complaint.

**B.  Estoppel**

76.     Defendant was and is under a continuous duty to disclose to Plaintiffs and the Class members the true characteristics and nature of its Poland Spring Water products.   Instead, Defendant actively, and beyond Plaintiffs' and the Class's control, knowingly concealed and misrepresented the true characteristics and nature of those products.

77.     Plaintiffs and the Class members reasonably relied on Defendant's knowing and affirmative misrepresentations and were unable to discover Defendant's active concealment of these facts despite diligently pursuing their rights.  For these reasons, Defendant is estopped from relying on any statute of limitations in defense of this action.

**C.  Discovery Rule**

78.     The causes of action alleged herein did not accrue until Plaintiffs and the Class discovered that Defendant's Poland Spring Water did not, in reality, contain spring water as defined by the FDA.

79.     Prior to the filing of this action and/or the results of the investigation that led to this action becoming known to them, Plaintiffs and the Class members had no realistic ability to discern that Poland Spring Water does not contain spring water as defined by the FDA.

## CLASS ACTION ALLEGATIONS

80.     Plaintiffs bring this lawsuit as a class action on behalf of themselves and all others similarly situated as members of the proposed Class pursuant to Federal Rules of Civil Procedure

23(a) and (b)(2) and/or (b)(3). This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

81. The proposed nationwide class Plaintiffs seek to represent is defined as follows:

> All persons or entities in the United States that purchased Poland Spring Water (not for resale) after November 5, 2003 (the "Nationwide Class" or the "Class").

82. In addition, the Plaintiffs seek to represent sub-classes of Class members that purchased Poland Spring Water in their respective home states, each of which is within Poland Spring's primary marketing area in the northeastern United States, between November 5, 2003 and the present (the "Class Period"). These state sub-classes (collectively, the "State Sub-Classes") are defined as follows:

> a. all Class members that purchased Poland Spring Water in the State of New York (the "New York State Sub-Class");
>
> b. all Class members that purchased Poland Spring Water in the State of New Jersey (the "New Jersey State Sub-Class"); and
>
> c. all Class members that purchased Poland Spring Water in the State of New Hampshire (the "New Hampshire State Sub-Class").

83. Excluded from the Class and State Sub-Classes are: (1) Defendant; any entity or division in which it has a controlling interest; its legal representatives, officers, directors, assignees, and successors; and its current and former employee; and (2) the judicial officers presiding over this matter and members of their immediate families.

84. Plaintiffs reserve the right to amend the Class definitions and to add additional sub-classes as appropriate if discovery and further investigation reveal that the Class should be expanded, otherwise divided into subclasses, or modified in any way.

**Numerosity & Ascertainability**

85.     Although the exact number of Class and State Sub-Class members is uncertain and can only be ascertained through appropriate discovery, the number is great enough such that joinder is impracticable.  Nestle Waters sells approximately one billion gallons of Poland Spring Water per year in the United States.

86.     The disposition of the claims of the Class and State Sub-Class members in a single action will provide substantial benefits to all parties and to the Court.  Class members are readily identifiable by objective means through reasonable effort.

**Typicality**

87.     Plaintiffs' claims are typical of the claims of the Class and State Sub-Class members, as Plaintiffs and the other members of the Class and State Sub-Classes sustained damages arising out of the same wrongful conduct by Defendant, as alleged herein.

**Adequate Representation**

88.     Plaintiffs will fairly and adequately represent and protect the interests of the Class and the State Sub-Classes.  Plaintiffs have retained counsel with substantial experience in prosecuting complex and class action litigation nationwide, including consumer class actions.

89.     Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the Class and the State Sub-Classes, and have the financial resources to do so.  Neither Plaintiffs nor their counsel have interests adverse to those of the Class or the State Sub-Classes.

**Predominance of Common Issues**

90.     There are numerous questions of law and fact common to Plaintiffs and Class and State Sub-Class members that predominate over any question affecting only individual Class or

State Sub-Class Members, the answer to which will advance resolution of the litigation as to all Class and State Sub-Class members.  These common legal and factual issues include, *inter alia*:

 a. whether Defendant engaged in the conduct alleged herein;

 b. whether Defendant's conduct violates state consumer protection statutes and false advertising laws or constitutes common law fraud or breach of contract;

 c. whether Defendant complied with FDA regulations governing the marketing, labeling and selling of bottled water;

 d. whether Defendant bottled, marketed, distributed, or sold Poland Spring Water under false and deceptive circumstances;

 e. whether Defendant's conduct harmed Plaintiffs and other members of the Class and State Sub-Classes;

 f. whether Plaintiffs and other members of the Class and State Sub-Classes overpaid for Poland Spring Water;

 g. whether Defendant's conduct tolls applicable limitations periods by acts of fraudulent concealment, application of the discovery rule, and/or equitable estoppel;

 h. whether the Court should enjoin Defendant from continuing to engage in the conduct complained of herein;

 i. the appropriate measure of relief, including, but not limited to, a preliminary injunction; and

 j. the extent of the Damages caused by Defendant's acts.

### Superiority

91. Plaintiffs and other Class and State Sub-Class members have all suffered and will continue to suffer harm and damages as a results of Defendant's unlawful and wrongful conduct. A class action is superior to other available means for the fair and efficient adjudication of this controversy.

92. Absent a class action, most Class and State Sub-Class members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy

at law.  Because of the relatively small size of the individual Class and State Sub-Class members' claims, it is likely that few if any Class or State Sub-Class members could afford to seek legal redress for Defendants' misconduct as alleged herein.  Absent a class action, Class and State Sub-Class members will continue to incur damages, and Defendant's misconduct will continue without remedy.

93.    Class action treatment of common questions of law and fact would also be a superior method to multiple individual actions or piecemeal litigation in that class action treatment will conserve the resources of the courts and the litigants, and will promote consistency and efficiency of adjudication.

## ON BEHALF OF THE NATIONWIDE CLASS

### Count I

### Fraud

94.    Plaintiffs repeat, reallege, and incorporate by reference each of the foregoing allegations as though fully set forth herein.

95.    Plaintiffs bring this count on behalf of the Nationwide Class.

96.    Nestle Waters intentionally, or with reckless disregard for the truth, concealed from Plaintiffs that its Poland Spring Water fails to comply with the FDA's standard of identity for spring water.  In doing so, Nestle deprived Plaintiffs and Class members of material information that was relevant to their purchasing decision.

97.    Nestle Waters affirmatively misrepresented to Plaintiffs, on the company's Poland Spring Water labels, that Poland Spring Water is "100% Natural Spring Water" bottled from natural springs in Maine.  In reality, Poland Spring Water does not contain spring water within the

meaning of FDA regulations governing the sale of bottled water, and as such is not "100% Natural Spring Water."

98.     Nestle Waters knew that these representations were false when made.

99.     Nestle Waters had a duty, imposed by FDA regulations, to label its Poland Spring Water bottles accurately as another type of water—*e.g.*, "bottled water," "drinking water," "well water," "ground water," or "purified water"—instead of labeling it "100% Natural Spring Water" because none of the water that Nestle Waters bottled or sold as Poland Spring Water was sourced from a natural spring or qualified as spring water within the FDA's standard of identity.

100.     In purchasing Poland Spring Water, Plaintiffs and the other Class members relied on the misrepresentations on Nestle Waters' labels.  Had Nestle Waters disclosed the truth about its Poland Spring Water's characteristics and source, Plaintiffs and the other Class members would not have purchased Poland Spring Water or would have paid substantially lower prices for it.

101.     Nestle Waters' misrepresentations concerned facts that would typically be relied on by a consumer purchasing bottled spring water, and as such, these misrepresentations were material.

102.     As a result of their reliance on Nestle Waters' false and deceptive labeling of Poland Spring Water, Plaintiffs and the other Class members have been injured in an amount to be proven at trial, including but not limited to their lost benefit of the bargain and overpayment at the time of purchase of Poland Spring Water.

103.     Plaintiffs and the Class are entitled to an award of punitive damages because Defendant's conduct was knowing, intentional, with malice, demonstrated a lack of care, and was in reckless disregard for the rights of Plaintiffs and the Class members.

104.    Plaintiffs and the Class face a threat of continuing harm arising from Defendant's deceptive practices and are entitled to a permanent injunction barring Defendant from labeling, marketing and selling Poland Spring Water as "spring water."

## ON BEHALF OF THE STATE SUB-CLASSES

### Count II

**Violations of New York General Business Law § 349**
**(N.Y. GEN. BUS. LAW § 349**

105.    Plaintiffs repeat, reallege, and incorporate by reference each of the foregoing allegations as though fully set forth herein.

106.    Plaintiffs bring this Count on behalf of the New York State Sub-Class.

107.    Pursuant to New York General Business Law § 349, "deceptive acts or practices in the conduct of any business, trade or commerce" are unlawful.

108.    In the conduct of its business, Nestle Waters willfully failed to disclose and concealed that: (i) Poland Spring Water was not in compliance with FDA regulations governing the labeling and sale of bottled water; (ii) Poland Spring Water was not "100% Natural Spring Water," as its label indicated; (iii) contrary to its label, it was not, in fact, sourced from natural springs; and (iv) the natural springs from which Nestle Waters claimed to have sourced its Poland Spring Water do not actually exist.

109.    As set forth in N.Y. GEN. BUS. LAW §349, Nestle Waters' conduct included unconscionable acts or practices and unfair or deceptive acts or practices, including: (i) misrepresenting the purported characteristics, qualities, and benefits of Poland Spring Water; (ii) advertising Poland Spring Water with an intent to sell a different product than advertised; and (iii) otherwise engaging in conduct likely to deceive.

110.    The foregoing conduct occurred in the conduct of Nestle Waters' business, trade or commerce.

111.    Nestle Waters' conduct proximately caused injuries to Plaintiffs and the other New York State Sub-Class members.

112.    Plaintiffs and the other New York State Sub-Class members were injured as a result of Nestle Waters' conduct.    As a direct and natural consequence of Nestle Waters' misrepresentations and omissions, Plaintiffs and the other New York State Sub-Class members overpaid for Poland Spring Water and did not receive the benefit of their bargain.

113.    Plaintiffs, individually and on behalf of the other New York State Sub-Class members, request that this Court enter such orders or judgments as may be necessary to enjoin Nestle Waters from continuing its unfair, unlawful, and/or deceptive practices and a permanent injunction banning Defendant from marketing and selling Poland Spring Water as "100% Natural Spring Water."

114.    Plaintiff and the New York State Sub-Class members are entitled to recover the greater of their actual damages or $50.  Because Nestle Waters acted willfully and/or knowingly, Plaintiffs and the other New York State Sub-Class members also seek to recover an amount not to exceed three times actual damages, up to $1,000, as well as attorneys' fees.

## Count III

### Violations of New York General Business Law § 350
### (N.Y. Gen. Bus. Law § 350)

115.    Plaintiffs repeat, reallege, and incorporate by reference each of the foregoing allegations as though fully set forth herein.

116.    Plaintiffs bring this count on behalf of the New York State Sub-Class.

117.    Pursuant to New York General Business Law § 350, "[f]alse advertising in the conduct of any business, trade or commerce" is unlawful.  The definition of "false advertising" includes "advertising, including labeling, of a commodity . . . if such advertising is misleading in a material respect," taking into account "the extent to which the advertising fails to reveal facts material in light of . . . representations [made] with respect to the commodity . . . ."  N.Y. GEN. BUS. LAW § 350-A.

118.    By and through the labeling of Nestle Waters' Poland Spring Water brand, Nestle Waters caused to be made or disseminated in New York statements that were untrue or misleading, and, moreover, which were known, or which by the exercise of reasonable care should have been known to Nestle Waters, to be untrue and misleading to consumers, including Plaintiffs and the other New York State Sub-Class members.

119.    Because Nestle Waters' labeling of its Poland Spring Water as "100% Natural Spring Water," as well as its misrepresentations and omissions regarding Poland Spring Water's compliance with FDA regulations, were material and likely to deceive a reasonable consumer, Nestle Waters has violated New York General Business Law § 350.

120.    As a result of Nestle Waters' false advertising of its Poland Spring Water, Plaintiffs and the other New York State Sub-Class members have suffered injury, including the loss of money.  Plaintiffs and the other New York State Sub-Class members relied upon Nestle Waters' misrepresentations as to the nature and quality of Poland Spring Water in purchasing Poland Spring Water.  These representations by Defendant were untrue because Poland Spring Water did not comply with applicable FDA regulations.  Had Plaintiffs and the other New York State Sub-Class members known the truth, they would not have purchased Poland Spring Water or would have purchased it at a lower price.

121.    Plaintiffs and the other New York State Sub-Class members therefore overpaid for their Poland Spring Water and did not receive the benefit of the bargain for their Poland Spring Water.

122.    Plaintiffs, individually and on behalf of the other New York States Sub-Class members, request that this Court enter such orders or judgments as may be necessary to enjoin Nestle Waters from continuing its unfair, unlawful, and/or deceptive practices and a permanent injunction banning Defendant from marketing and selling Poland Spring Water as "100% Natural Spring Water."

123.    Plaintiffs and the New York States Sub-Class members are each entitled to recover their actual damages or $500, whichever is greater.  Because Nestle Waters acted willfully and/or knowingly, Plaintiffs and the other New York State Sub-Class members are each entitled to recover three times actual damages, up to $10,000, as well as attorneys' fees.

## Count IV

### Violations of the New Jersey Consumer Fraud Act
### (N.J. STAT. ANN. §§ 56:8-1, *et seq.*)

124.    Plaintiffs repeat, reallege, and incorporate by reference each of the foregoing allegations as though fully set forth herein.

125.    Plaintiffs bring this Count on behalf of the New Jersey State Sub-Class.

126.    The New Jersey Consumer Fraud Act, N.J. STAT. ANN. §§ 56:8-1, *et seq.*, prohibits unfair or deceptive acts or practices in the conduct of any trade or commerce.

127.    In the conduct of its business, Defendant willfully failed to disclose and actively concealed that: (i) Poland Spring Water was not in compliance with FDA regulations governing bottled spring water; (ii) contrary to its labels, Poland Spring Water was neither collected nor

sources from natural springs; and (iii) the springs that Nestle Waters identified as the source of its Poland Spring Water do not in fact exist.

128.    Accordingly, Nestle Waters engaged in unfair and deceptive trade practices, including: (i) misrepresenting the purported characteristics, qualities, and benefits of Poland Spring Water; (ii) advertising Poland Spring Water with an intent to sell a different product than advertised; and (iii) otherwise engaging in conduct likely to deceive.

129.    The foregoing conduct occurred in the conduct of Nestle Waters' business, trade or commerce.

130.    Nestle Waters' conduct proximately caused injuries to Plaintiffs and the other New Jersey State Sub-Class members.

131.    Plaintiffs and the other New Jersey State Sub-Class members were injured as a result of Nestle Waters' conduct.  As a direct and natural consequence of Nestle Waters' misrepresentations and omissions, Plaintiffs and the other New Jersey State Sub-Class members overpaid for Poland Spring Water and did not receive the benefit of their bargain.

132.    Plaintiffs and the New Jersey State Sub-Class members are entitled to compensatory damages, restitution by way of full refunds of the purchase price for all their purchase of Poland Spring Water, treble or other punitive damages, attorneys' fees and a permanent injunction banning Defendant from marketing and selling Poland Spring Water as "100% Natural Spring Water."

133.    Plaintiffs will comply with N.J. STAT. ANN. § 56:8-20 by mailing a copy of this Complaint to the New Jersey Attorney General within 10 days.

## Count V

### Violations of the New Hampshire Consumer Protection Act
### (N.H. REV. STAT. ANN. § 581-A:1, *et seq.*)

134.    Plaintiffs repeat, reallege, and incorporate by reference each of the foregoing allegations as though fully set forth herein.

135.    Plaintiffs bring this Count on behalf of the New Hampshire State Sub-Class.

136.    Plaintiffs, the members of the New Hampshire States Sub-Class, and Nestle Waters are "persons" under the New Hampshire Consumer Protection Act, N.H. REV. STAT. § 358-A:1.

137.    Nestle Waters' actions as set forth herein occurred in the conduct of "trade commerce" as defined under N.H. REV. STAT. § 358-A:1.

138.    The New Hampshire Consumer Protection Act prohibits a person, in the conduct of any trade or commerce, from using "any unfair or deceptive act or practice," including "but . . . not limited to, the following: . . . (V) [r]epresenting that goods or services have . . . characteristics, . . . uses, benefits or qualities that they do not have;" "(VII) [r]epresenting that goods or services are of a particular standard, quality, or grade, . . . if they are of another;' and "(IX) [a]dvertising goods or services with intent not to sell them as advertised."  N.H. REV. STAT. § 358-A:2.

139.    Nestle Waters participated in unfair and deceptive act and practices that violated the New Hampshire Consumer Protection Act as described herein.  Nestle Waters engaged in prohibited deceptive business practices by fraudulently labeling its Poland Spring Water to make it appear that the bottles contained "100% Natural Spring Water," including: (i) misrepresenting the purported characteristics, qualities, and benefits of Poland Spring Water; (ii) advertising Poland Spring Water with an intent to sell a different product than advertised; (iii) representing that its Poland Spring Water is of a particular standard and quality when it is not; (iv) representing that the subject of a transaction involving Poland Spring Water has been supplied in accordance with a previous representation when it has not; and (v) otherwise engaging in unconscionable, false, misleading, or deceptive acts and practices in the conduct of trade or commerce.

140.    In the course of its business, Nestle Waters labeled common bottled groundwater as "100% Natural Spring Water," concealed that its Poland Spring Water failed to comply with the FDA's standard of identity for spring water and other regulations as described herein, and otherwise engaged in activities with a tendency or capacity to deceive.

141.    Nestle Waters also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Poland Spring Water.

142.    Nestle Waters has knowingly used common groundwater in its Poland Spring Water and known the true nature of Poland Spring Water for at least two decades, but concealed that information.

143.    By failing to disclose and by actively concealing the true quality and characteristics of Poland Spring Water, by labeling Poland Spring Water as "100% Natural Spring Water," and by presenting itself as a company that valued consumer welfare and provided truthfully labeled high quality products, Nestle Waters engage in unfair and deceptive business practices in violation of the New Hampshire Consumer Protection Act.

144.    In the course of Nestle Waters' business, Defendant willfully failed to disclose and actively concealed that: (i) Poland Spring Water was not in compliance with FDA regulations governing bottled spring water; (ii) contrary to its labels, Poland Spring Water was neither collected nor sources from natural springs; and (iii) the springs that Nestle Waters identified as the source of its Poland Spring Water do not in fact exist.

145.    Nestle Waters' unfair and deceptive acts and practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs and the New Hampshire State Sub-Class, as to the true quality and characteristics of Poland Spring Water.

146.    Nestle Waters knowingly misrepresented material facts regarding its Poland Spring Water brand with an intent to mislead Plaintiffs and the members of the New Hampshire States Sub-Class.

147.    Nestle Waters knew or should have known that its conduct violated the New Hampshire Consumer Protection Act.

148.    As alleged above, Nestle Waters made material statements concerning the quality and characteristics of Poland Spring Water and the Nestle Waters brands that were either false or misleading:

149.    Nestle Waters owed Plaintiffs and the other members of the New Hampshire State Sub-Class a duty to disclose the true quality and characteristics of Poland Spring Water because Nestle Waters:

a.  possessed exclusive knowledge that it valued profits over consumer welfare, truthful advertising, and lawfulness, and that it was labeling, selling, and distributing Poland Spring Water throughout the United States that did not comply with FDA regulations:

b.  intentionally concealed the foregoing conduct from Plaintiffs and the other members of the New Hampshire State Sub-Class; and/or

c.  made incomplete representations about the quality and characteristics of Poland Spring Water generally, and the true nature of the groundwater it bottled as "100% Natural Spring Water" in particular, while purposefully withholding material facts from

Plaintiffs and the other members of the New Hampshire State Sub-Class that contradicted these representations.

150.    Nestle Waters' fraudulent use of regular groundwater rather than natural spring water in its Poland Spring Water and its concealment of the true quality and characteristics of Poland Spring Water were material to Plaintiffs and the other members of the New Hampshire State Sub-Class.  Bottled spring water that is actually sourced from naturally-occurring springs is worth more than mislabeled groundwater sold by t a company that falsely represents that its water is "100% Natural Spring Water" and conceals the water's true nature and quality.

151.    Plaintiffs and the New Hampshire State Sub-Class suffered ascertainable loss caused by Nestle Waters' misrepresentations and its concealment of and failure to disclose material information.

152.    Pursuant to the New Hampshire Consumer Protection Act, Nestle Waters had an ongoing duty to all purchasers of Poland Spring Water to refrain from unfair and deceptive acts and practices.

153.    All purchasers of Poland Spring Water suffered ascertainable loss in the form of overpayment for Poland Spring Water due to Nestle Waters' deceptive and unfair acts and practices that occurred in the course of Nestle Waters' business.

154.    Nestle Waters' violations present a continuing risk to Plaintiffs as well as to the general public.  Nestle Waters' unlawful acts and practices complained of herein affect the public interest.

155.    As a direct and proximate result of Nestle Waters' violations of the New Hampshire Consumer Protection Act, Plaintiffs and the New Hampshire State Sub-Class have suffered injury-in-fact and/or actual damage.

156.    Because Nestle Waters' willful conduct caused injury to the property of New Hampshire State Sub-Class members through violations of the New Hampshire Consumer Protection Act, each member of the New Hampshire State Sub-Class seeks recovery of the greater of their actual damages or $1,000, treble damages, costs and reasonable attorneys' fees.

157.    Plaintiffs and the New Hampshire State Sub-Class members are also entitled to a permanent injunction against Nestle Waters' unfair and/or deceptive acts and practices and banning Defendant from marketing and selling Poland Spring Water as "100% Natural Spring Water," and any other just and proper relief under N.H. REV. STAT. §358-A:10.

## PRAYER FOR RELIEF

**WHEREFORE** Plaintiffs demand judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Federal Rule of Civil Procedure 23, and Certifying Plaintiffs as Class and State Sub-Class Representatives;

B.    Awarding Plaintiffs and the other members of the Class and State Sub-Classes statutory, treble, punitive, or any other form of damages provided by and pursuant to the statutes cited above;

C.    Awarding Plaintiffs and the other members of the Class and State Sub-Classes restitution, disgorgement or other monetary or equitable relief provided by and pursuant to the common law claims and statutes cited above or as the Court deems just and proper;

D.    Enjoining Defendant from continuing the wrongful acts and practices alleged;

E.    Awarding Plaintiffs and the other members of the Class and State Sub-Classes pre-judgment and post-judgment interest;

F.      Awarding Plaintiffs and the other members of the Class and State Sub-Classes reasonable attorneys' fees and costs of suit, including expert witness fees; and

G.      Awarding such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands trial by jury.

Dated:  September 1, 2017

Respectfully submitted,

*/s/ Shannon L. Hopkins*
**LEVI & KORSINSKY, LLP**
Shannon L. Hopkins
Stephanie A. Bartone
733 Summer Street, Suite 304
Stamford, CT 06901
Telephone:  (203) 992-4523
Facsimile:  (212) 363-7171
shopkins@zlk.com
sbartone@zlk.com

**POMERANTZ LLP**
Jeremy A. Lieberman
J. Alexander Hood II
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
Facsimile:  (212) 661-8655
jalieberman@pomlaw.com
ahood@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone:  (312) 377-1181
Facsimile:  (312) 377-1184

**BRONSTEIN, GEWIRTZ
& GROSSMAN, LLC**
Peretz Bronstein
60 East 42nd Street, Suite 4600

New York, NY 10165
(212) 697-6484
peretz@bgandg.com